UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| ERIC SHURON TAYLOR, | ) | |
| --- | --- | --- |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 CV 50006 |
| | ) | Magistrate Judge Iain D. Johnston |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Eric Shuron Taylor brings this action under 42 U.S.C. § 405(g), seeking reversal of the decision denying him social security benefits. As explained below, the case is remanded.

## BACKGROUND

In 1999, when he was 29 years old, plaintiff began working as a metal worker for Alcoa. He was employed almost eight years, working "60 to 80 hours a week." R. 44, 46. He then experienced what his therapist later described as an emotional and physical breakdown. R. 615. He had a constellation of complaints, many which still plague him today, including fatigue, joint pain, memory and other cognitive problems, vertigo, sleep difficulties, headaches, and depression. Plaintiff believed that these problems were caused by something on the job site, perhaps chemical exposure. He complained to his supervisors and was fired soon thereafter in 2007. R. 18. He never learned why he was fired, but suspects that it may have been because of complaints about poor work conditions.

Since the onset of his problems, plaintiff has seen multiple doctors and nurse practitioners in a search of an explanation for his problems. He has been given an amalgam of diagnoses—both physical and mental—including bipolar disorder, PTSD, depression, anxiety disorder, sleep

apnea, fibromyalgia, arthritis, and (most recently) Sjogren's syndrome. He has also been prescribed numerous medications, including Neurontin and Tramadol. R. 615. It is still not clear whether his symptoms may relate back to a single cause or whether he suffers from multiple overlapping problems. Plaintiff's struggle to obtain a definitive diagnosis has been hampered by his lack of insurance and his inability to be seen by a rheumatologist, the specialist other doctors recommended he should see. Below is a summary of the key doctor visits.

In May 2008, plaintiff began receiving mental health treatment at the Janet Wattles Center. He saw Dr. Dubois, a psychiatrist, a few times, but mostly participated in group therapy. Dr. Dubois diagnosed plaintiff with bipolar disorder, alcohol abuse, and personality disorder. R. 46. 280. As reported in a nurse's note, Dr. Dubois was asked whether plaintiff could work. The nurse wrote: "Dr. Dubois reviewed the chart [and] determined [that plaintiff] was able to work currently." R. 312.[1]

Plaintiff did not feel that he was getting better with this therapy at Janet Wattles Center and so switched to Dr. Martha Crotts, a private psychiatrist. R. 23. He saw Dr. Crotts every 30 to 60 days over the next few years. R. 706.

In October 2008, plaintiff began seeing a licensed clinical social worker, Jeanne Flesch, for therapy every week or two for almost four years. By her account, she provided "steady emotional support for both emotional and physical-medical improvement." R. 659.

Plaintiff also saw a sleep specialist, Dr. Victor Thappa, who diagnosed him with sleep apnea and prescribed C-PAP machine. At a September 2009 visit, Dr. Thappa observed that,

---

[1] In her opinion, the ALJ noted that Dr. Dubois concluded in October 2008 that plaintiff was able to work. R. 84. As support for this assertion, the ALJ cited only to Exhibit 1F, which is 87 pages, and did not include a pinpoint cite. After reviewing the exhibit, this Court concludes that the ALJ was referring to the quoted sentence above. The Court could not find any other elaboration or commentary from Dr. Dubois explaining the basis for this conclusion.

despite the treatment for sleep apnea, plaintiff continued to "report a plethora of complaints that are hard to put together." R. 372. These included depression and shoulder, wrist, and knee pain along with morning stiffness and sleep problems including non-restorative sleep. Dr. Thappa suggested that plaintiff see a rheumatologist.

On June 23, 2010, plaintiff filed his applications for disability, claiming an alleged onset date of February 2, 2007. R. 73.

On August 22, 2010, a person named J. Gange filled out a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. (Both documents are collected together as Ex. 10F.) As an initial point, these two forms do not indicate Gange's occupation. There is no occupational designation on the signature block, as is typical on these forms, such as "Dr." or "Ph.D." Gange concluded that plaintiff did not meet the Section 12 mental health listings. According to Gange, although plaintiff "might be incapable of completing complex tasks" and "might prefer to avoid prolonged public contact," plaintiff could "manage the stresses involved in a simple work environment." R. 469.

During this general time frame, plaintiff also saw his regular physician, Dr. Adekola A. Ashaye. R. 475. In these visits, Plaintiff continued to complain about symptoms such as diffuse myalgias and memory loss. *See, e.g.,* R. 530. Dr. Ashaye diagnosed plaintiff with fibromyalgia, and prescribed medication.[2] *Id.* Like Dr. Thappa, Dr. Ashaye believed that plaintiff should see a rheumatologist. R. 527.

In first half of 2011, Ms. Flesch noted that plaintiff was continuing in his effort to obtain a rheumatology appointment. Part of the problem was finding a doctor who would take plaintiff

---

[2] For background information on fibromyalgia, see *Stedman's Medical Dictionary*, p. 725 (28th ed. 2006) ("A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown.").

as a patient given that he had no insurance or means to pay. *See* R. 630 ("Trying to get a rheumatologist who will accept Township" payments). Although no doctor was ever found, and to this day plaintiff has never seen a rheumatologist, either for treatment or a consultative examination, plaintiff was eventually referred to a Tammy Kucia, a nurse practitioner who specialized in rheumatology issues. Plaintiff saw Ms. Kucia multiple times from mid-2011 through mid-2012. *See* Exs. 21F and 27F. In some of her notes (but not in all of them), she continued to indicate that plaintiff had fibromyalgia. R. 528. Then in January 2012, Ms. Kucia diagnosed plaintiff with a new condition—Sjogren's syndrome—and prescribed Plaquenil.[3] R. 718. According to plaintiff's brief, Ms. Kucia diagnosed this condition through a blood test and a physical examination of plaintiff's hands, elbows, and shoulders. Dkt. #14 at 5. Plaintiff saw Ms. Kucia again in May 2012, shortly before the administrative hearing. Here, she listed Sjogren's syndrome as a diagnosis along with polyarthritis. R. 718.

On April 23, 2012, Ms. Flesch completed a form entitled "Medical Opinion Re: Ability to Do Work-Related Activities (Mental)." Ex. 23F. In the check-box portion of the form, she indicated that plaintiff's abilities in various categories were "poor or none." She also attached seven pages of detailed handwritten notes (single-line-spaced). She stated, among other things:

---

[3] For background information on Sjogren syndrome, *see Stedman's Medical Dictionary*, p. 1914 (28th ed. 2006) ("keratoconjunctivitis iscca, dryness of mucous membranes, telagiectasias or purpric spots on the face, and bilateral parotid enlargement"). And again, for background, *see* the Mayo Clinic website, which describes Sjogren's syndrome as an autoimmune disorder in which the immune system "first targets the moisture-secreting glands of your eyes and mouth" but then can also damage other parts of your body such as joints and internal organs. Plaintiff cited to, and relied upon, the Mayo Clinic website in his opening brief, Dkt. #14, p. 9 – 10, when addressing Sjogren's syndrome. The Government did not dispute the accuracy of the information cited. Accordingly, this Court has avoided the excellent and well-taken concerns about judges independently researching websites raised by Judge Hamilton's dissent in *Rowe v. Gibson*, No. 14-3316, p. 29 - 47 (Seventh Circuit, August 19, 2015).

- Difficulty retaining information, especially sequential information. Often gets dates and times confused. Difficulty grasping passages of time. Needed numerous repetition of questions for this exam.

- Fatigue, physical pain, mentally gets hard to think. Great difficulty initiating things due to fatigue, physical pain, dizzy spells with vertigo, mental fatigue and exhaustion.

- Mental distractions, physical pain. Neck, back and leg pain just sitting in chair. When forgets to take [Seroquel], has great difficulty with concentration as he feels "high." Therapist has seen such frequently in weekly 1 1/2 hour sessions. Physical pain gets overwhelming, and "just gets to me."

- Had to cancel one health class sponsored by Township due to a physical pain flare-up episode. He was almost dropped form Township due to such. Has had to reschedule numerous therapy appointments because of physical and/or mental episodes. Had to give up volunteering at a Food Pantry, as physically could not get out of bed due to pain. Actually lost an employment opportunity at the Pantry due to such.

R. 566-67. Ms. Flesch estimated that plaintiff would have to miss on average more than four days a month. R. 565.

Dr. Crotts also completed this same form. Ex. 25F. Her handwritten comments include the following:

- This pt. has Bipolar Disorder, Anxiety Disorder, and poor physical health that cumulatively greatly impair his abilities to take care of basic needs (hygiene, housekeeping), interact functionally [around] others, and perform any sort of job.

- Pt. has substantial deficits [in] regard to working memory (thinking on one's feet), short term memory (recalling short set of instructions), and has limited ability to initiate tasks, plan or organize them to completion; <u>any</u> minor stress results in anxiety, immobilization mentally.

- Pt. is unable to tolerate much stimulation around him, and his high anxiety and poor cognitive skills impair interactions [around] others.

- chronic pain and fatigue, and frequent vertigo would limit type of jobs he could do, and I seriously doubt he would be able to perform <u>any</u> work [with] consistency.

R. 703-04 (emphasis in original). Dr. Crotts estimated that plaintiff on average would have to miss more than four days per month. *Id.*

On May 15, 2012, a hearing was held before the administrative law judge ("ALJ"). Plaintiff's counsel complained at the outset that the agency had not ordered any consultative examinations:

> I don't think that the record has been fully developed. There were no CE's done in this case, either medical or psychological. And it appears that [there is] subjective evidence that he has Sjogrens syndrome, which is as you know [] an immune disorder. I'm not a doctor. I can't interpret this information or the results of testing which are positive. And I think there either needs to be a medical expert brought in, or he needs an evaluation with a rheumatologist to look into that, to see if [] he meets a listing for Sjogrens syndrome because some of the symptoms that he is suffering from, that have been attributed to a psychological basis, may also be a part of Sjogrens syndrome, particularly the fatigue and the malaise. And I don't think that Dr. Shapiro is competent to address those questions.

R. 12. The ALJ asked whether plaintiff's treating rheumatologist had been contacted, and counsel stated that plaintiff did not have a treating rheumatologist and had only been able to see a physician's assistant at Crusader Clinic (*i.e.* Ms. Kucia). R. 13 ("All of his treatment that he's received is free medical care because he has no insurance coverage, he doesn't have a medical card."). The ALJ then stated that she would make a determination at the end of the hearing whether to keep the record open. R. 14.

Plaintiff testified about his current medical problems, essentially elaborating on the list of symptoms set out above. He stated that he felt he could not work because he could not sit down all day, because he gets tired and has to sleep, and because he has pain that can be so aggravating he cannot get out of bed. R. 20. He has pain in his knees, his hands, and feet, especially at night. R. 27. His body sometimes seizes up, especially when it is humid, and he has muscle spasms in his back or cramps when it is cold. He has headaches and is dizzy at times. He stated: "some mornings I wake up [and] I'm not in as much pain but I'm extremely weak where all I can do is

lay back down. It's just like my body is just going haywire and I can't do too much about it. [ ] And all I can do is just lay down, basically just ball up and lay down. I don't want to be touched. I don't want to bother with anything. It's just – my body just feels extremely strange." R. 27-28.

The ALJ called Dr. Terry Shapiro, a psychologist, to testify as a medical expert. Dr. Shapiro found that plaintiff did not meet a Section 12 mental health listing. R. 49. Dr. Shapiro stated that he disagreed with Dr. Crotts' opinion that plaintiff could not work. He pointed to several entries from Dr. Crotts' notes and argued that they suggested that plaintiff was feeling better with treatment. R. 50.

At the end of the hearing, the ALJ stated that she did not see any need for a consultative examination regarding the mental health impairments. R. 63. The ALJ then referred to the recent diagnosis of Sjogren's syndrome and whether a consultative examination should be ordered. Unfortunately, the transcript is not clear. It appears that the ALJ chose not to order an examination. This conclusion is based on the fact that plaintiff's attorney followed up by asking for 30 days to get an opinion on the Sjogren's syndrome. R. 64. The ALJ agreed to leave the record open for 30 days. Plaintiff's counsel, for some unknown reason, did not follow up.

After the hearing, plaintiff's attorney submitted a letter from Dr. Crotts in which she referred to the specific notes that Dr. Shapiro pointed to as supposedly showing improvement and explained why Dr. Shapiro had misinterpreted those notes. R. 706-07.

On September 21, 2012, the ALJ issued an opinion denying plaintiff's applications. The ALJ found that plaintiff had the following severe impairments: polyarthralgias/Sjogren's syndrome; cervical spine degenerative disc disease; major depressive disorder; and alcohol abuse. The ALJ found that plaintiff did not have a severe impairment of fibromyalgia. The ALJ found that plaintiff had the residual functional capacity ("RFC") to do light work. In the RFC

analysis, the ALJ analyzed the medical opinions. She gave either "little" or "minimal" weight to the opinions of Dr. Crotts, Dr. Ashaye, Ms. Flesch, and Ms. Kucia. The ALJ instead relied on the opinions of Dr. Dubois ("great weight"), Gange ("great probative value"), and Dr. Shapiro ("substantial weight"). R. 84-87.

**DISCUSSION**

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). And, as the Seventh Circuit has repeatedly held, the federal courts

cannot build the logical bridge on behalf of the ALJ. *See Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, *33-34 (N.D. Ill. 2013).

Plaintiff raises a number of intersecting arguments for remand. He argues that the ALJ failed to fully develop the record by not ordering a consultative exam for both his physical and mental impairments, by not obtaining records from two prior disability claims (which may have included a consultative exam), by not getting records from several doctors (including his primary physician in 2008, Dr. Aaron Coates, and two years of records from Ms. Flesch). Plaintiff claims that the ALJ improperly relied on alleged gaps in treatment when the gaps were really only the result of the failure to procure medical records; failed to consider the severity of Sjogren's Syndrome; failed to consider the side effects from his medications; and failed to properly consider his fibromyalgia. Plaintiff also attacks the ALJ's credibility finding in several ways, arguing for example that it was improper to find him not credible because he failed to exercise and lose weight. Plaintiff argues that the ALJ improperly discounted the opinions of two treating physician and two physician's assistants. There is a lot to sort through.

After reviewing the briefs, the Court finds that a remand is appropriate. The most significant issue—and one sufficient to order a remand—is the ALJ's failure to follow the treating physician rule. 20 C.F.R. § 404.1527(c)(2). The rule requires the SSA decision makers to "consider *all*" of the following factors in deciding the weight to give to *any* medical opinion: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6). These are the "checklist factors." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). They are designed to help the ALJ

"decide how much weight to give to the treating physician's evidence." *Id.* But within the weighing process, treating physician opinions receive particular consideration. A treating physician's opinion is entitled to controlling weight if it is supported by medical findings and consistent with other substantial evidence in the record. *Id.*; *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must determine what specific weight, if any, the opinion should be given. *Moss v. Astrue¸* 555 F.3d 556, 561 (7th Cir. 2009). To make this determination, the ALJ must apply the checklist of factors set forth in 20 C.F.R. § 404.1527(c)(2). *Campbell*, 627 F.3d at 308; *Bauer*, 532 at 608.

In this case, the ALJ did not apply the clear two-step process. Instead, the ALJ conflated the process into a single, amalgamated discussion without applying the regulations. R. 84-86. First, the ALJ did not explicitly determine whether the opinions of plaintiff's treating physicians (Dr. Crotts and Dr. Ashaye) should be given controlling weight.[4] Second, the ALJ never laid out the checklist, and certainly did not explicitly apply it. R. 26-29. As discussed below, the ALJ

---

[4] However, the ALJ did discuss these opinions in a general way, identifying certain alleged flaws and ultimately assigning those opinions little weight. The latter determination is implicitly a determination that these opinions were not given controlling weight. Still, the ALJ did not explicitly apply the criteria in the rule.

periodically referred to aspects of the checklist, such as the length of treatment, but did so in an inconsistent way, indicative of cherry-picking.[5]

The clearest instance of the failure to follow the rule is when the ALJ, in discussing what severe impairments plaintiff had, rejected plaintiff's fibromyalgia diagnosis. Here is the ALJ's reasoning:

> While several of the claimant's doctors diagnosed him with fibromyalgia, none noted any tender points during an examination. This lack of evidence leaves insufficient evidence of fibromyalgia under the Centers for Disease Control (CDC) criteria. Therefore, the claimant's diffuse muscle and joint pains are treated as severe [] polyarthalgias/Sjogren's syndrome.

R. 76. The ALJ basically overruled a doctor's diagnosis, and did so without relying on any agency doctor or medical expert opinion. *See Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013) (remanding where no medical opinion from consultative physician or other medical evidence to support ALJ's findings regarding limitations). The three experts relied on by the ALJ in the opinion opined about only psychological issues, and none of them analyzed plaintiff's alleged fibromyalgia.

The ALJ's explanation quoted above, even if it were supported by expert testimony, is flawed. Claiming to rely upon the Center for Disease Control, the ALJ rejected Dr. Ashaye's diagnosis because the ALJ concluded that there was no indication that plaintiff had a sufficient number of tender points to meet the fibromyalgia standard. But the presence of tender points—

---

[5] In a recent opinion, this Court discussed the tension existing in two lines of Seventh Circuit cases on whether ALJs must explicitly apply the checklist. *See Duran v. Colvin*, 2015 WL 4640877, *7-9 (N.D. Ill. Aug. 4, 2015). As discussed there, this Court favors the line of cases requiring ALJs to explicitly apply the checklist. Under this standard, the ALJ's decision here clearly would not be sufficient. As the Court further noted in *Duran*, other Seventh Circuit cases have employed a more forgiving approach by looking essentially at whether the ALJ implicitly applied the checklist or, stated slightly differently and more charitably, complied with the general spirit of the rule. Even if the Court were to apply this more forgiving standard, it would find a remand is appropriate.

spots on the body where pain is felt when a doctor applies pressure—is no longer the criteria used by the CDC and was changed in 2010 (*i.e.* before the ALJ's ruling). Dkt. #14 at 11. As plaintiff explains in his brief, the current CDC diagnostic criteria instead relies on a "widespread pain index" and "symptom severity scale." *Id.* The government in its response brief does not dispute plaintiff's assertions. Even under the prior criteria, it is not clear (as the ALJ presupposed) that plaintiff did not have the requisite number of tender points. Later in his opinion, the ALJ noted: "There was diffuse tenderness in the claimant's fingers, elbows, and AC joints bilaterally." R. 81. Whether this type of tenderness qualifies under the prior standard is not clear, but it at least raises a question as to whether plaintiff indeed met even the prior standard. The ALJ's overruling of Dr. Ashaye's diagnosis is problematic for another reason. As explained in *Stedman's Medical Dictionary* , fibromyalgia is hard to diagnose and one diagnostic factor is whether there are other underlying conditions that might be causing the symptoms. To rule out a myriad of other possible causes makes it even more important for there to be an expert opinion, preferably from a rheumatologist, rather than having the ALJ make a lay, arm-chair diagnosis after one interaction with plaintiff. [6]

In sum, by engaging in her own analysis of the evidence, by failing to properly apply the checklist factors, and by overruling the diagnosis of plaintiff's physician, the ALJ violated the treating physician rule and improperly played doctor. *See Moon v. Colvin*, 763 F.3d 718, 722

---

[6] It is true that, although the ALJ found that plaintiff did not have fibromyalgia, the ALJ accepted the diagnosis of Ms. Kucia that plaintiff had Sjogren's syndrome, thus arguably finding an alternative underlying condition to explain the symptoms. But the ALJ did not explain why, after rejecting the opinion of Dr. Ashaye, she turned around and blindly accepted the opinion of Ms. Kucia (there was never a doctor who diagnosed plaintiff with Sjogren's syndrome). Relatedly, the ALJ did not acknowledge that Ms. Kucia had also diagnosed plaintiff with fibromyalgia. The ALJ thus only accepted one of the diagnoses from Ms. Kucia. In short, although it is possible that a rheumatologist might ultimately agree with the ALJ's assessment on remand, there are too many red flags in the current analysis to establish the necessary logical bridge from the evidence to the conclusions as required by the case law.

(7th Cir. 2014) (the ALJ should "rely on expert opinions instead of determining the significance of particular medical findings themselves"); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). This is a ground for remand.

More broadly, the ALJ also failed to provide a consistent explanation for why she credited the opinions of some healthcare providers and not others. Therefore, it is not possible to conclude that she implicitly applied the checklist factors. Consider the first and second factors: (a) the length of treatment and (b) the nature and extent of the treatment relationship. The ALJ failed to acknowledge the disparity in treatment levels among the providers whose opinion supported plaintiff versus those whose opinions were relied on by the ALJ. Notably, Ms. Flesch saw plaintiff for approximately four years with regular therapy sessions lasting an hour or more. Although the record only contains records from two of the four years of treatment, these records still document over 50 visits. By extrapolation, this would mean that there were somewhere in the neighborhood of 100 visits overall. Although less frequent, Dr. Crotts and Dr. Ashaye saw plaintiff multiple times over a several-year period. Ms. Kucia saw plaintiff multiple times for almost a year. In contrast, the three providers relied on by the ALJ collectively barely saw plaintiff. Dr. Dubois saw plaintiff twice; Dr. Shapiro and Gange never examined plaintiff. Despite this significant difference in length and frequency of treatment, the ALJ only mentioned the length of treatment when she noted, in a negative way, that Ms. Kucia had only been treating plaintiff "for several months." R. 86. But this "analysis" is inconsistent. This very same criticism could have been applied equally, if not more so, to the opinions of Dr. Dubois, Dr. Shapiro, and Gange. But the ALJ never mentioned this fact.

As for degree of specialization, another checklist factor, the ALJ was again inconsistent. The ALJ claimed she gave great weight to Dr. Dubois because she was a "psychiatric specialist."[7] R. 84. The ALJ likewise found Dr. Shapiro's opinion deserved more weight because he was "a psychological specialist."[8] R. 86. There is nothing wrong with the ALJ noting these facts, and they would be relevant in comparing these two doctors to Ms. Flesch who was a social worker. But the ALJ never acknowledged that Dr. Crotts was a psychiatrist and thus should have been given the same credibility enhancement.

As for factors three, four, and six (supportability of the opinion, consistency with the record as a whole, and other factors which tend to support or contradict the opinion), the Court finds that the ALJ also failed to consistently and even-handedly apply them. To cite just one example, the ALJ faulted Ms. Flesch for relying on plaintiff's "own subjective statements" in reaching her conclusions. R. 85. But this criticism is fundamentally faulty on two levels. First, as the Seventh Circuit recently stated, "psychiatric assessments normally are based primarily on what the patient tells the psychiatrist, so that if the judge were correct, most psychiatric evidence would be totally excluded from social security disability proceedings." *Price v. Colvin*, __ F.3d __, 2015 WL 4503198, * (7th Cir. July 24, 2015); *see also Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015). Second, there is nothing suggesting that Dr. Dubois, Dr. Shapiro, or Gange used a different approach and relied on anything other than subjective statements. As a basic point of fairness, the ALJ should strive to apply the same criteria across the board. Similarly, the ALJ discounted Dr. Ashaye's testimony because it was given in October 2010 and April 2011, before later evidence came to light supposedly showing that plaintiff's condition had improved. But at

---

[7] As far as this Court can tell, Dr. Dubois did not have any specialty within psychiatry that was applicable to plaintiff's conditions. In other words, in using the phrase "psychiatric specialist," the ALJ was merely stating that Dr. Dubois was a psychiatrist.

[8] Again, the Court believes the ALJ was merely stating that Dr. Shapiro is a psychologist.

the same time, the ALJ readily accepted the opinion of Dr. Dubois given in 2008, much earlier, and did not raise any concern about the fact that Dr. Dubois was not able to consider later evidence.

The ALJ found that the opinions of Dr. Crotts and Ms. Flesch were supposedly inconsistent with the fact that plaintiff was never hospitalized, that he was not given more medications, and that he did not have poor hygiene on certain visits. However, these assertions are not a sufficient basis for disregarding plaintiff's treating healthcare providers. The ALJ cited to no authority requiring that a plaintiff be hospitalized before any psychiatric condition could be found disabling. Moreover, in her post-hearing letter, Dr. Crotts anticipated and addressed these assertions directly: "The majority of the time, Mr. Taylor is not actively suicidal, which would require acute hospitalization. However, he does often experience morbid, negative thoughts about himself and his life, has chronic fatigue and pain, is socially isolative, and pretty hopeless. He can manage to get himself dressed and feed himself, but many days, he is unable to accomplish much more. Any stress of any sort greatly affects him, and often results in acute exacerbation of mood symptoms and marked deterioration in function, which is already poor at baseline." R. 707. The ALJ speculated that plaintiff could have taken additional medications but did not point to any medications beyond the myriad of prescriptions he was already taking. In sum, the ALJ failed to apply the same rigor when evaluating all the medical opinions.

The Court recognizes that neither Ms. Flesch and Ms. Kucia are doctors and thus are not "acceptable medical sources" whose opinions must be explicitly evaluated under the checklist factors. At the same time, the Seventh Circuit and this Court has emphasized that an ALJ may not reject an opinion by a nurse practitioner simply because he or she is not an acceptable medical source. *See Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015) (citing 20 C.F.R.

§404.1513); *Strobach v. Colvin*, 2014 WL 1388285, *11-12 (N.D. Ill. Apr. 9, 2014) (noting that the ALJ rejected a nurse's opinion without analyzing the checklist factors). Here, the ALJ indicated that both women were not acceptable medical sources. This statement alone is not, in this Court's view, an error given that the ALJ did not rely on it as the sole reason for giving little weight to their opinions. However, the additional reasons cited by the ALJ provided an insufficient basis for giving little weight to their opinions. Several of these reasons have already been discussed above. To cite one more example, the ALJ argued that Ms. Flesch "offer[ed] very little specifics regarding observations during appointments." R. 84. In making this assessment, the ALJ seemed to be pointing to the numerous one-page authorization forms Ms. Flesch submitted after each therapy visit to the Township. *See* Ex. 24F. The ALJ failed to acknowledge that these forms were check-off forms with little room for comment, and Ms. Flesch typically only included only a few phrases. *See, e.g.*, R. 655 ("finally got 1 yr. prescription for Neurontin – sleep/pain"). There is no indication that Ms. Flesch was using these forms to convey the full gamut of symptoms and problems. In contrast, on Exhibit 23F, which is the agency form that this Court quoted in the bulleted list in the fact section, Ms. Flesch provided thorough and detailed comments, adding *seven* pages of handwritten comments, well beyond what the form actually required and more than this Court typically sees in most social security cases. When viewed in their totality, it is unreasonable to assert that her opinions contain "very little specifics." To the extent that the ALJ believed that Ms. Flesch's opinions lacked specifics (itself an unfair accusation), then the ALJ should have also applied the same criticism to the opinion of Dr. Dubois, which consisted (insofar as this Court can tell) of only one hearsay statement written by a nurse. The Court finds that the ALJ's assessment of Ms. Kucia's opinions was similarly inconsistent. It is true that she is not a doctor, although she reportedly has a specialty in

rheumatology. The ALJ gave her opinion little weight, yet nonetheless accepted her diagnosis that plaintiff had Sjogren's syndrome.[9]

In light of the above, the Court finds that a remand is warranted. On remand, the Court strongly encourages the ALJ to order a consultative examination with a rheumatologist or to call an impartial medical expert who can opine about plaintiff's rheumatology-related symptoms. Because this case will be remanded, and because the issue of the treating physicians' opinions is fundamental, the Court finds it unnecessary to address the remaining arguments. However, on remand, the ALJ should look at *all* these issues with fresh eyes.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the decision of the ALJ is remanded for further consideration.

Date: August 21, 2015        By: _____
                                  Iain D. Johnston
                                  United States Magistrate Judge

---

[9] As noted above, the Court has concerns about whether the reviewer named Gange, whose opinion the ALJ accepted without question, is a doctor (and if so, what speciality) as opposed to a nurse or social worker.